UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Thomas Walker, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:19-cv-50233 |
| | ) | |
| v. | ) | |
| | ) | Judge Iain D. Johnston |
| John Baldwin, John Varga, John Craft, and Colin Brinkmeier, *in their official and individual capacities*, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Dixon Correctional Center is a medium-security prison, operated by the Illinois Department of Corrections (IDOC). Thomas Walker is a Rastafarian, so he wears dreadlocks. Walker was initially housed at Stateville Correctional Center, during which time he was never told that his dreadlocks violated any policy or that they needed to be cut. Several weeks after arriving at Dixon, Walker was told by staff at Dixon that he needed to cut his dreadlocks because they were unsearchable. Walker initially refused because cutting hair was against his religious beliefs as a Rastafarian. He ultimately submitted to having his dreadlocks cut. He then regrew his dreadlocks during his remaining time at Dixon without being forced to cut the dreadlocks. Photographs of Walker when he arrived at IDOC and when he was released show that his dreadlocks were basically the same at both times.

He brings this suit under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), alleging that Dixon (Defendants Varga, Craft, and Brinkmeier) and IDOC staff (Defendant Baldwin) violated his

1

right to free exercise of his Rastafarian religion. For the reasons that follow, Defendants' motion for summary judgment [74] is granted.

## Facts

The Illinois Administrative Code permits individuals in custody to have any length of hair as long as it does not create a security risk.[1] Any individual in custody who creates a security risk may be asked to abide by an individual grooming policy. IDOC Administrative Directive (AD) 05.03.160 gives the Chief Administrative Officer discretion to determine if an individual grooming policy is necessary in that situation. Specifically, the AD explains that a security risk arises if an individual's hairstyle impedes or prevents staff from conducting a thorough search of the hair for contraband, if contraband can be hidden in the hair undetected, or if hidden contraband can injure staff as they attempt to search the hair. The purpose of the grooming policy is to ensure the safety and security of the prison. On October 27, 2017, Warden Varga issued a bulletin stating, in relevant part, "Offenders with unsearchable hair styles will NO longer be allowed to keep such hair style due to security concerns. Offenders with this style will be required to cut their hair." (Explicit in this bulletin is that before October 27, 2017, "unsearchable hair styles" were permitted.) As a result of the AD and Warden Varga's bulletin, it appears that Dixon staff simply shorthanded these directives into an across-the-board policy that prohibited dreadlocks, on the belief that all dreadlocks were "unsearchable." So, at Dixon, all dreadlocks needed to be cut off—at least in theory. The purported purpose of this de facto policy was to ensure safety and security. At Dixon, inmates are advised as to whether his hairstyle is a security risk at their intake interviews, which can happen at any time. This policy

---

[1] The facts are drawn primarily from the parties' LR 56.1 statements and responses. Dkts. 75, 82, 83, 91.

applies to all individuals in custody, and, after Warden Varga's bulletin, it was typical procedure to force incoming inmates with dreadlocks to cut their hair.

Thomas Walker is a Rastafarian. He began growing his dreadlocks in 2013. Walker initially arrived at IDOC (Stateville) in March of 2018. He was then transferred to Dixon on April 13, 2018. During these weeks, no IDOC employee informed Walker that his dreadlocks were a safety or security threat or that they were unsearchable.

As implausible and suspicious as it seems, Varga, Brinkmeier, and Baldwin swore under penalty of perjury that they had never heard of Rastafarianism, and they were unfamiliar with Rastafarian beliefs and practices, which forbid cutting of hair.

On May 25, 2018—over a month after Walker's arrival at Dixon—Colin Brinkmeier conducted Walker's intake interview and told him that he would need to cut his hair. Walker protested, stating that he was a Rastafarian. Later that day, John Craft called Walker to internal affairs and gave him a direct order to cut his hair. He was placed in segregation on May 25, 2018. In the next few days, Walker filed a grievance, explaining that his Rastafarian beliefs prohibited him from cutting his hair. The grievance was denied on August 15, 2018.

On May 30, 2018, Craft gave Walker a second direct order to cut his hair. Again, Walker refused. On June 1, 2018, Craft gave Walker a third and final order to cut his hair.[2] Based on his fear that physical force would be used, Walker reluctantly allowed his dreadlocks to be removed by the prison barber. He was not asked to cut his hair again, so he began the process of regrowing his hair in dreadlocks. During his incarceration at Dixon, Walker saw other inmates with dreadlocks. While incarcerated at Dixon, Walker sued. On July 30, 2021, Walker was

---

[2] Walker alleges that Dixon's "Orange Crush" tactical team was present. Defendants dispute this insofar as the citation provided does not support the fact. Dkt. 91, ¶ 16. However, Defendants do not cite to any other material disputing this—in fact, Defendant Craft's own deposition testimony, attached to his LR 56.1 statement supports this. Dkt. 75-3, at 42:16-43:23.

3

released from Dixon. At the time, his hair was dreadlocked. Indeed, photographs show that Walker's dreadlocked hair and beard were substantially the same when he arrived at IDOC and when he was released from Dixon.

Despite being forced to have his dreadlocks cut off in June of 2018, Walker was able to practice his Rastafarianism. He complains of no other acts that infringed on his religion, such as dietary restrictions. Indeed, as just stated, he immediately began regrowing his dreadlocks and they were never removed before he left.

## **Summary Judgment Standard**

A successful motion for summary judgment demonstrates that there is no genuine dispute of material fact and judgment is proper as a matter of law. A party opposing summary judgment must proffer specific evidence to show a genuine dispute of fact for trial. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the non-movant when viewing the record and all reasonable inferences drawn from it in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party opposing summary judgment "is entitled to the benefit of all favorable inferences that can reasonably be drawn from the underlying facts, but not every conceivable inference." *De Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987). The court must construe the "evidence and all *reasonable* inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008) (emphasis added). Summary judgment is appropriate only when the court determines that "no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016).

## Analysis

**Preliminary Issues**

The Court is compelled to address four preliminary factual and legal issues. First, factually, on summary judgment, the Court is not permitted to make credibility determinations. But the sworn representations, particularly from the Director and Warden, about being unfamiliar with Rastafarianism—in year 2021—is stunning. It is hard to image an even moderately well-read person or even a person with just ordinary life experiences not knowing about Rastafarianism. Have they never listened to the radio? Have they never seen *Cool Runnings*? Did they not understand the Bob Marley reference in *Caddyshack*?[3] Did these people really live such isolated and sheltered existences? The claimed ignorance of Rastafarianism is particularly incredible when claimed by individuals in the corrections field. Cases involving Rastafarianism—in particular, dreadlocks—in correctional settings have been litigated in the Seventh Circuit for nearly four decades. *See, e.g., Reed v. Faulkner*, 842 F.2d 960, 962 (7th Cir. 1988). Indeed, these cases are routinely litigated throughout the country. And, sometimes, Rastafarians have successfully litigated RLUIPA cases challenging the removal of their dreadlocks. *See, e.g., Ware v. Louisiana Dep't of Corr.*, 866 F.3d 263 (5th Cir. 2017). Further, law enforcement has written about issues relating to accommodations for Rastafarians for years. *See, e.g., Rights of Rastafarian Employees and Inmates*, 2015 (8) AELE Mo. L. J. 201, https://nicic.gov/rights-rastafarian-employees-and-inmates. And for twenty years the United States Department of Justice has recognized Rastafarianism as a bona fide religion. *See* U.S. Dep't of Justice, Fed. Bureau of Prisons, Inmate Religious Beliefs and Practices Guide, 274

---

[3] No doubt Bob Marley gets much of the well-deserved credit for introducing reggae and Rastafarianism to the world. But there were many others, including, but not limited to, Lee "Scratch" Perry, and Toots and the Maytals—music legends in their own rights.

(2002). But, because Walker never contests these claims and presents no evidence to contradict these claims and the Court cannot make credibility determinations on summary judgment, the Court is bound to accept them as true.

Second, again as to factual representations, the Court is troubled by the Defendants' purported justification for the de facto policy of cutting off Walker's dreadlocks. Defendants have introduced a parade of horribles as to the dangers and security concerns caused by dreadlocks. All manner of weapons, tools, and escape devices apparently can be hidden in dreadlocks, according to their testimony. Of course, if all that is true, then why was Walker allowed to not only keep his dreadlocks during the first few months of his incarceration at IDOC but also allowed to regrow the dreadlocks for the remainder of his time at Dixon? Moreover, as Walker's counsel voluminously demonstrated in his brief, numerous correctional centers have and continue to allow inmates to wear dreadlocks. Furthermore, as Varga's bulletin notes, the policy was new, so dreadlocks were apparently allowed at Dixon for some time without catastrophic chaos ensuing. Moreover, in this case, as in other cases involving the removal of dreadlocks, Walker states that other inmates wore dreadlocks and were not forced to have them removed. But the Supreme Court has made clear that correctional professionals are to be given deference in making security decisions. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Lewis v. Sternes*, 712 F.3d 1083, 1086 (7th Cir. 2013) ("But we give considerable weight to the defendants' uncontradicted testimony that the thickness and density of the plaintiff's dreadlocks made it difficult to search."). And the Seventh Circuit has stated that correctional officers need not act immediately or with perfect, consistent regularity. *Lewis*, 712 F.3d at 1085; *Williams v. Snyder*, 367 Fed. App'x 679, 682 (7th Cir. 2010). At some point, however, bald, contradictory, and implausible representations from IDOC cannot be blindly accepted. *See*

6

*Tucker v. Dickey*, 613 F. Supp. 1124, 1128 (W.D. Wisc. 1985) ("Thus, the rule of deference does not preclude all judicial review of prison procedures."); *see generally Mudge Rose Guthrie Alexander & Ferdon v. U.S. Int'l Trade Comm'n*, 846 F.2d 1527, 1532 (D.C. Cir. 1988) (deference does not mean blind acceptance). This case is close but does not reach that level.

Third, insufficient evidence exists to establish Director Baldwin's personal involvement. He did not create the AD or Warden Varga's bulletin, and there is no evidence he even knew about it. And, unsurprisingly, he was not involved in the removal of Walker's dreadlocks. Baldwin did not even review or sign the denial of Walker's grievance. There is simply insufficient evidence—none, really—that Baldwin was personally involved in any of Walker's claims. *Delapz v. Richardson*, 634 F.3d 893, 899 (7th Cir. 2011); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996). This entitles Baldwin to summary judgment.

Fourth, legally, Walker's RLUIPA claim fails because he has already been released.[4] A claim under RLUIPA may only be brought by an institutionalized person, and because Walker is no longer in custody at Dixon or anywhere else in the IDOC, he may not pursue a claim under the statute. *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012). Further, the only relief available under RLUIPA is injunctive, which, for the same reasons, is moot. *Nelson v. Miller*,

---

[4] In a footnote in his response, Walker states, "Defendants also violated the [RLUIPA], but that act does not include a damages remedy and so the RLUIPA claim is not being pursued." Dkt. 81, at 6 n.1. Yet, throughout his memorandum, he analyzes his claim under the RLUIPA standard. *See, e.g.*, Dkt. 81, at 11, 14, 17 ("RLUIPA provides that government prison officials are prohibited from imposing a substantial burden on a prisoner's religious exercise unless that burden (1) furthers a compelling interest, and (2) is the least restrictive means of furthering the interest.") (citing 42 U.S.C. § 2000cc-1(a)). Walker uses this standard in the sections of his memorandum arguing free exercise, and even includes section headings expressly referencing the RLUIPA standard, such as "Defendants Fail to Conduct an Individualized Inquiry as Required under RLUIPA." Dkt. 81, at 14. Defendants call attention to this throughout their memorandum in reply, Dkt. 90 (although they rely on the RLUIPA standard in their opening memorandum). Indeed, the Court is confused as to why all parties argued the merits of the RLUIPA claim throughout the briefing, including issues relating to substantial burden, compelling government interest and whether the de facto policy was the least restrictive means available. The Court takes Walker at his word that he is no longer pursing the RLUIPA claim. Controlling Seventh Circuit law holds that he has no claim upon his release. *Nelson*, 570 F.3d at 888.

570 F.3d 868, 884, 888 (7th Cir. 2009) (declining to recognize a claim for damages against in their individuals acting under color of law in RLUIPA). Walker's release entitles Defendants to summary judgment on the RLUIPA claim, to the extent Walker did not abandon it.

**Defendants Are Entitled to Summary Judgment on the Free Exercise Claim**

Defendants argue that they are entitled to summary judgment based on qualified immunity. Dkt. 76, at 12. Qualified immunity shields government employees from liability unless a plaintiff shows (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (explaining that "qualified immunity shields from liability [defendants] who act in ways they reasonably believe to be lawful"). If either is answered in the negative, the defendant official is protected by qualified immunity. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). The right claimed to be violated must be defined at the appropriate level of specificity under the particularized facts. *Reed v. Palmer*, 906 F.3d 540, 547-48 (7th Cir. 2018). Plaintiffs bear the burden to demonstrate the alleged violation of their rights was clearly established. *Id.* at 546. To show that the law was clearly established, plaintiffs can take one of three routes: (1) they can identify existing precedent that placed the constitutional question beyond debate; (2) they can demonstrate through a broad survey of relevant case law that there was such a clear trend that the recognition of the right was merely a question of time; or (3) their case involves a constitutional violation that is so patently obvious that they not need present any analogous case law. *Id.* at 547.

Walker has failed to establish any constitutional right was violated, let alone one that was clearly established. As a general principle of constitutional law, he has no claim. That fact alone dooms Walker's claim. Regardless, even applying the relevant test results in the same

8

conclusion. The appropriate test is found in the Supreme Court's decision in *O'Lone v. Shabazz*, 482 U.S. 342, 348-50 (1987). *See, e.g., Holmes v. Engleson*, Case No. 16 C 5234, 2017 U.S. Dist. LEXIS 126228, at *14 (N.D. Ill. Aug. 9, 2017).

A First Amendment Free Exercise claim in the prison context is analyzed under a reasonableness test to "afford appropriate deference to prison officials." *O'Lone*, 482 U.S. at 349. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *O'Lone*, 482 U.S. at 349. The Supreme Court uses three factors in this analysis: (1) whether there is a valid, rational connection to the legitimate governmental interest invoked to justify it; (2) whether there are alternative means available for inmates to exercise their beliefs; and (3) the impact an accommodation would have on other prisoners, staff, and prison resources generally. *Turner*, 482 U.S. at 89-90; *O'Lone*, 482 U.S. at 350-53.

As to the first factor, "the governmental objective must be a legitimate and neutral one" that operates "without regard to the content of the expression." *Turner*, 482 U.S. at 90. Initially, there is no evidence that the AD or Varga's bulletin are arbitrary or irrational. Defendants have presented evidence that dreadlocks can and have been used to conceal contraband. *Holmes*, 2017 U.S. Dist. LEXIS 126228, at *17-20. Obviously, prison security is a legitimate and rational objective. Further, the AD and Varga's bulletin are regulations of general applicability. They apply to all inmates regardless of their religions. And regulations of general applicability, not intended to discriminate against a religion or a particular religious sect, do not violate the free exercise clause. *Grayson*, 666 F.3d at 452-53.

As to the second factor, courts look to "whether the inmates were deprived of 'all means of expression.'" *O'Lone*, 482 U.S. at 352 (quoting *Turner*, 482 U.S. at 92). In *O'Lone*, this

factor weighed in favor of prison administrators because the inmates were able to participate in other ceremonies as proscribed by their religion; that they could not exercise one specific aspect of their religion was not a denial of free exercise.[5] *Id.* As to this factor, Walker admitted that he was able to practice Rastafarianism. The only imposition on his free exercise was the single incident when his dreadlocks were removed. But other than that, he was free to practice his chosen religion. In fact, apparently, he was free to regrow his dreadlocks.

As to the last factor, the Court acknowledged that accommodations would likely have a "ripple effect" on a prison's "limited resources" and therefore, "courts should be particularly deferential to the informed discretion of corrections officials." *Id.* at 90. Defendants have presented sufficient evidence supporting this factor. There are simply insufficient resources to adequately and constantly search each inmate's individual dreadlocks. *Holmes*, 2017 U.S. Dist. LEXIS 126228, at *21-22.

The Court finds that Defendants' actions were reasonably related to a legitimate penological interest. And "even if other methods were available, the First Amendment does not require that the prison adopt the least restrictive means of achieving its security goals, just a reasonable one." *Goetting*, 854 Fed. App'x 47, 50 (7th Cir. 2021) (citing *Holt*, 574 U.S. at 357-58). So, no constitutional right, let alone a clearly established one, was violated.

Furthermore, Walker has failed to show a clearly established right under these particularized facts through any route. Walker has not presented a closely analogous case establishing a constitutional right to wear dreadlocks. (Again, Walker cannot proceed on his

---

[5] In *Holt v. Hobbs*, on a Muslim inmate's RLUIPA challenge to a prison's beard grooming policy, the Court held that the existence of alternative means of practicing religion was a relevant consideration under a Free Exercise analysis but not under RLUIPA. 574 U.S. 352, 361-62 (2015) (distinguishing the Free Exercise tests in *Turner* and *O'Lone* from the "substantial burden" inquiry under RLUIPA). Here, that Walker admitted he had other means of practicing his Rastafarianism in Dixon is particularly relevant to this Court's analysis.

10

RLUIPA claim now.) Additionally, Walker has not presented the Court with a clear trend in case law showing that the establishment of the right is an eventuality. Finally, the removal of an inmate's dreadlocks is not patently unconstitutional. Walker's attempt to show a clearly established right by detailing the numerous other jurisdictions that do not prohibit dreadlocks is unavailing. That different executive branch officials make different policy choices does not establish a constitutional right.

On the contrary, the overwhelming case law negates his assertion that a clearly established right was violated. A decade ago, the Seventh Circuit stated, "The case law indicates that a ban on long hair, including dreadlocks, even when motivated by sincere religious belief, would pass constitutional muster." *Grayson v. Schuler*, 666 F.3d 450, 452 (7th Cir. 2012). Again, it is Walker's burden to show that his right was clearly established. Not only is his claimed right not clearly established, but also the case law is overwhelming contrary to his claim. *See, e.g., Lewis*, 712 F.3d at 1087; *Williams*, 367 Fed. App'x at 681-82; *Holmes*, 2017 U.S. Dist. LEXIS 126228, at *23. Indeed, because of this overwhelming case law, courts have granted qualified immunity to prison officials in similar cases. *Holmes*, 2017 U.S. Dist. LEXIS 126228, at *23-26.

## Conclusion

For the above reasons, the Court grants Defendants' motion for summary judgment on all counts. Judgment shall enter. Civil case terminated.

Date: June 30, 2022    By: _____
IAIN D. JOHNSTON
United States District Judge